<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| PETER W. MCAVOY, | |
| Plaintiff, | Civil Action No. 15-6824-BRM-DEA |
| v. | |
| NISSAN NORTH AMERICA, INC., | **OPINION** |
| Defendant. | **TEMPORARILY FILED UNDER SEAL** |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Defendant Nissan North America, Inc.'s ("Nissan") Motion for Summary Judgment. (ECF No. 30.) Plaintiff Peter W. McAvoy ("McAvoy") opposes the motion. (ECF No. 33.) Pursuant to Federal Rule of Civil Procedure 78(b), the Court did not hear oral argument. For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**.[1]

**I.   BACKGROUND[2]**

Nissan, a car manufacturing company, has a field sales operation that is divided into five regions—Northeast, Southeast, Midwest, Central, and West. (Nissan's Statement of Facts (ECF No. 30-5) at 1 and McAvoy's Counter Statement of Facts (ECF No. 33-1) at 13–14.)

---

[1] McAvoy filed Exhibit E (ECF No. 33-7) and Exhibit L (ECF No. 33-14) to its opposition under temporary seal. (ECF No. 35). Nissan moved to permanently seal the two exhibits and McAvoy consented to the motion. (ECF No. 37.) Therefore, the Court will file this memorandum opinion under temporary seal. The parties shall notify the Court within fifteen days as to whether they believe the opinion should remain sealed and submit joint proposed redactions if necessary.

[2] These facts are undisputed and are taken primarily from the parties' statements and additional statements of undisputed material facts, L.Civ.R. 56.1, and responses. (ECF No. 30-5; ECF No. 33-1; ECF No. 36.) The Court will designate any additional or disputed facts as appropriate.

Approximately 300 of Nissan's employees nationwide work in the field sales operation. (ECF No. 30-5 at 1 and ECF No. 33-1 at 14.) McAvoy has worked for Nissan in its field sales and marketing organization since 1983. (ECF No. 30-5 at 2 and ECF No. 33-1 at 14.)

Between 1983 and 1998, McAvoy held several different positions within the organization. (ECF No. 30-5 at 2 and ECF No. 33-1 at 15.) In 1998, McAvoy became the Regional Parts and Service Manager for the Northeast Region, a position he held for approximately ten years. (ECF No. 30-5 at 2; ECF No. 33-1 at 3, 15; Nissan's Response to Counter Facts (ECF No. 36) at 3.) In that role, he supervised a team of twenty-five employees. (ECF No. 30-5 at 2; ECF No. 33-1 at 3, 15; ECF No. 36 at 2.) As an employee, McAvoy's position was associated with a salary grade. (ECF No. 30-5 at 2 and ECF No. 33-1 at 14.) McAvoy's salary was $192,005 per year. (ECF No. 30-5 at 3 and ECF No. 33-1 at 15.)

In 2008, Nissan implemented "CORE," a reorganization of the field sales organization. (ECF No. 30-5 at 3; ECF No. 33-1 at 3, 15; ECF No. 36 at 2.) As a result of this reorganization, McAvoy's job title changed, and, while the salary grade level associated with his new job title was reduced across the field sales organization, his salary remained at $192,005 per year. (ECF No. 30-5 at 3; ECF No. 33-1 at 3, 15; ECF No. 36 at 2.) McAvoy did not receive an increase in salary after 2008. (ECF No. 30-5 at 3 and ECF No. 33-1 at 15.)

As part of the reorganization, Nissan also created the position of Area Manager within each of the five regions. (ECF No. 30-5 at 3 and ECF No. 33-1 at 15.) McAvoy remained in the same position though the twenty-five employees no longer reported directly to him. (ECF No. 30-5 at 3; ECF No. 33-1 at 3, 15; ECF No. 36 at 3.)

In October 2011, McAvoy moved from the Parts and Service Manager position to the Associated Business Manager position. (ECF No. 30-5 at 4; ECF No. 33-1 at 3, 16; ECF No. 36

2

at 3.) As an Associated Business Manager, McAvoy's duties included overseeing Nissan's certified pre-owned program, car rental, loyalty programs, and extended service contracts. (ECF No. 30-5 at 4; ECF No. 33-1 at 3-4, 16; ECF No. 36 at 3.) Also in October 2011, as part of the reorganization, several employees in the Northeast Region were moved to different districts or different positions within the region or switched jobs. (ECF No. 33-1 at 4 and ECF No. 36 at 3.)

McAvoy informed his supervisor, Regional Operations Manager Timothy Gilbert ("Gilbert"), that McAvoy wanted his salary "red-circled" and that he wanted Nissan to make that commitment in writing.[3] (ECF No. 30-5 at 4 and ECF No. 33-1 at 1.) In October 2011, McAvoy was almost sixty years old and his primary concern "was his salary, not his job title or salary grade." (ECF No. 33-1 at 6 and ECF No. 36 at 7.) As of October 17, 2011, McAvoy began work as an Associated Business Manager at the same annual salary of $192,005. (ECF No. 30-5 at 6 and ECF No. 33-1 at 18.) During the October 2011 reorganization, McAvoy was the only employee who downgraded to a lower position with a lower salary grade. (ECF No. 33-1 at 7 and ECF No. 36 at 7.)

In April 2014, Nissan announced a restructuring of the field organization, known as the ROI, to become effective July 1, 2015. (ECF No. 30-5 at 7 and ECF No. 33-1 at 20.) As part of the ROI, Nissan restructured the regions and districts and also created additional districts. (ECF No. 30-5 at 7 and ECF No. 33-1 at 21.) The ROI impacted approximately 300 regional employees in different ways, including restructuring or consolidating certain positions, moving employees to

---

[3] Nissan and McAvoy largely dispute the characterization of the 2011 exchange, the meaning of "red-circling," and the impact, if any, it would have on McAvoy's salary in the future. (*See* ECF No. 30-5 at 4–6; ECF No. 33-1 at 4-7, 16–18; ECF No. 36 at 3–7.) Nissan defines "red-circling" as "a term used occasionally by Nissan management referring to an employee whose salary is temporarily frozen at a rate above the maximum salary of the employee's grade." (ECF No. 30-5 at 5.) McAvoy defines it as "meaning [his salary] would never be lowered." (ECF No. 33-1 at 5.)

new markets, asking employees to relocate, relocating certain jobs, and eliminating "a handful of jobs." (ECF No. 30-5 at 7–8; ECF No. 33-1 at 8, 21; ECF No. 36 at 8.)

On April 8, 2014, McAvoy met with Regional Vice President Gary Frigo ("Frigo"), Edith Ballard ("Ballard"), and Regional Operations Manager Jun Watanabe ("Watanabe"). (ECF No. 30-5 at 8; ECF No. 33-1 at 9, 22; ECF No. 36 at 9.) At this time, McAvoy received information regarding the ROI, including a salary reduction memo, and was asked to review the materials and decide what he wanted to do. (ECF No. 30-5 at 8; ECF No. 33-1 at 9, 22; ECF No. 36 at 9.) McAvoy was informed his salary would be reduced in steps on January 1, 2015, January 1, 2016, and September 1, 2016. (ECF No. 30-5 at 9 and ECF No. 33-1 at 23.) McAvoy was also informed he may be subject to further salary reductions after 2016. (ECF No. 30-5 at 9; ECF No. 33-1 at 9-10, 23; ECF No. 36 at 9–10.)

McAvoy was given the option to either accept the reclassified position of Regional Associated Business Manager or leave Nissan. (ECF No. 33-1 at 3 and ECF No. 36 at 9.) McAvoy informed Frigo, Ballard, and Watanabe that he had an agreement to have his salary "red-circled." (ECF No. 30-5 at 10 and ECF No. 33-1 at 23.) Ballard responded by putting her hands in the air and saying "ROI." (ECF No. 33-1 at 9 and ECF No. 36 at 9.) Ballard further stated that "this is ROI, this is regionalization. It's a different initiative." (ECF No. 33-1 at 9 and ECF No. 36 at 9.)

Prior to implementing the ROI, Nissan identified each employee subjected to the ROI based on certain factors, including their age and likelihood to retire. (ECF No. 33-1 at 10 and ECF No. 36 at 10.) Nissan informally tracked who was retirement eligible and the likelihood of who would retire. (ECF No. 33-1 at 8 and ECF No. 36 at 8.) After implementing the ROI, Nissan created a chart identifying the number of employees who chose to retire. (ECF No. 33-1 at 10 and ECF No. 36 at 10.)

4

On January 20, 2015, McAvoy attended a retirement party for Frigo, who was fifty-five years old. (ECF No. 30-5 at 12 and ECF No. 33-1 at 27.) At the party in front of thirty employees, Frigo yelled across the room to Watanabe, "When are you going to get McAvoy to retire?" (ECF No. 30-5 at 12; ECF No. 33-1 at 13, 27; ECF No. 36 at 12.) McAvoy was "shocked and surprised that Frigo would make the statement in that type of environment at his farewell party." (ECF No. 33-1 at 13 and ECF No. 36 at 12.)

On July 31, 2015, McAvoy filed suit against Nissan in New Jersey Superior Court, Law Division, Somerset County, alleging Nissan: (1) breached a contract (Count One); (2) breached the implied covenant of good faith and fair dealing (Count Two); (3) violated the New Jersey Law against Discrimination ("NJLAD") by engaging in disparate impact age discrimination (Count Three); and (4) violated the NJLAD by engaging in age discrimination (Count Four). (Compl. (ECF No. 1, Ex. A) at 5-7.) Nissan removed the matter to this Court on the basis of diversity jurisdiction, 28 U.S.C. § 1332(a). (ECF No. 1.) On April 21, 2017, Nissan filed this Motion for Summary Judgment. (ECF No. 30.) McAvoy opposes the Motion. (ECF No. 33.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary

5

judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## III. DECISION

### A. Breach of Contract (Count One)

Nissan argues McAvoy has not demonstrated he had an enforceable contract, and therefore, summary judgment must be granted in its favor. (ECF No. 30-4 at 16–19.) Nissan contends McAvoy cannot point to any terms of contractual promise by Nissan that are sufficiently definite to form a valid contract. (*Id.* at 18-19.) Specifically, according to Nissan, McAvoy's interpretation creates an indefinite promise of salary-for-life for McAvoy, which is unenforceable in New Jersey. (Nissan's Reply Br. (ECF No. 36-1) at 1-3.) Additionally, Nissan argues McAvoy did not provide the requisite consideration to form a contract because he did not give anything up or change his status in any way as he had no choice but to accept the Associated Business Manager position. (ECF No. 30-4 at 18-19.)

McAvoy contends Gilbert asked him to accept the newly created position of Associated Business Manager, and McAvoy agreed to this, provided he was "red circled," meaning his salary remained the same while employed at Nissan. (ECF No. 33 at 9–12.) According to McAvoy, accepting "a lower level position with a lower salary band" was sufficient consideration to form a contract with Nissan. (*Id.* at 14–15.) McAvoy contends the terms of the contract were sufficiently definite—McAvoy would accept a demotion to allow Nissan to rotate a younger employee into his former position to gain developmental experience, and in exchange McAvoy would continue to receive the same salary from

7

Nissan—and therefore enforceable. (*Id.* at 13–14.) McAvoy also points to numerous factual issues in dispute he contends should prevent the Court from entering summary judgment in favor of Nissan. (*Id.* at 14–15.)

To establish a claim for breach of contract, a plaintiff "must demonstrate the existence of: (1) a contract sufficiently clear and capable of judicial interpretation that is not vague or indefinite; and (2) adequate consideration." *Swider v. Ha-Lo Indus.*, 134 F. Supp. 2d 607, 618 (D.N.J. Mar. 9, 2001). Consideration is "a bargained-for exchange of promises or performance that may consist of an act, a forbearance, or the creation, modification, or destruction of a legal relation." *Sipko v. Koger, Inc.*, 70 A.3d 512, 521 (N.J. 2013) (quotation omitted). For both requirements, the Court must give McAvoy, as the non-moving party, the benefit of all reasonable inferences that may be drawn in his favor. *Shebar v. Sanyo Bus. Sys. Corp.*, 544 A.2d 377, 378 (N.J. 1988).

The Court finds there are genuine issues of fact as to whether the parties intended to form a binding contract. The question of whether the parties formed an agreement and whether McAvoy gave adequate consideration is an issue of fact to be resolved by the factfinder. *See Interlink Grp. Corp. USA, Inc. v. Am. Trade & Fin. Corp.*, No. 12-6179, 2014 WL 3578748, at *6 (D.N.J. July 18, 2014); *Troy v. Rutgers*, 774 A.2d 476, 486 (N.J. 2001). Regarding the parties' intent to enter into a valid contract, the Court finds, reading the record in the light most favorable to McAvoy, the record contains genuine disputes of material facts. *See Shebar*, 544 A.2d at 378. The parties disagree over the meaning and intent of the "red-circling" of McAvoy's salary. Nissan contends "red-circling" is "a term used occasionally by Nissan management referring to an employee whose salary is temporarily frozen at a rate above the maximum salary of the employee's grade." (ECF No. 30-5 at 5.) McAvoy disputes Nissan's position, stating "he agreed 'red-circling' to mean that 'whether I retire at 62, 65 or 70 years of age, I don't want my salary to be affected. I don't want my salary to be affected.'" (ECF No. 33-1 at 17.) McAvoy and

Nissan further disagree about whether assurances were made by Nissan to McAvoy that his salary would remain frozen. (ECF No. 30-5 at 5; ECF No. 33-1 at 5, 17; ECF No. 36 at 4–5.)

There are further material disputes of fact regarding whether valid consideration was offered by McAvoy. The parties disagree whether McAvoy had the option to accept the demotion or whether it was required by a mandatory personnel change. According to McAvoy, Gilbert requested that McAvoy accept the demotion in order to give a twenty-six year old employee, who was then reporting to McAvoy, a "higher salary grade for a developmental experience." (ECF No. 33-1 at 4.) Nissan disputes McAvoy's recounting of the conversation, and instead contends Gilbert did not present the personnel changes to McAvoy as a request. (ECF No. 36 at 3–4.)

The Court also disagrees with Nissan that the contract would not be enforceable as a matter of law because its terms are too vague. *Savarese v. Pyrene Mfg. Co.*, 89 A.2d 237 (N.J. 1952), relied upon by Nissan, is distinguishable. In *Savarese*, the plaintiff alleged the employer promised that it would "take care of [him]" and that he would keep his position as foreman for "the rest of [his] life" if he suffered an injury in a company baseball game. *Id.* at 238. The New Jersey Supreme Court found that even "[a]ccepting at full value the plaintiff's version of the conversation which took place . . . , the terms are vague and uncertain and do not comply with the precision and clarity required by the law." *Id.* at 241. The court reasoned that "no salary was agreed upon nor was provision made as to what would occur if the plaintiff became wholly or partially unable to perform his duties." *Id.* at 239. The *Savarese* court found the promise of a foreman's job for life to be vague and ambiguous, and more analogous to an unenforceable "friendly assurance of employment" than a binding contract. *Id.* at 241 (citation omitted).

Here, a factfinder could find definiteness in the terms of agreement. A salary of $192,005 per year was already established and agreed upon by McAvoy and Nissan. Although the length of contract

9

is not exact here, the length does not rise to the level of an open-ended "for life" contract as in *Savarese*. The record indicates the terms of red-circling McAvoy's salary could be read as either a temporary duration for the length of a developmental rotation (ECF No. 30-5 at 5), or until McAvoy retired, which would be in a number of years (ECF No. 33-1 at 17.)

Giving McAvoy the benefit of all reasonable inferences as the non-moving party, the Court finds a factfinder could conclude the parties intended to enter into a binding contract and that McAvoy had the option to accept the demotion and did so in exchange for having his salary frozen. Accordingly, Nissan's Motion for Summary Judgment on Count One is **DENIED**. *See, e.g.*, *Schecter v. Schecter*, No. 07-419, 2008 WL 5054343, at *4 (D.N.J. Nov. 26, 2008) ("The Court will not grant summary judgment when there is a material issue of fact as to whether an enforceable oral contract exists in the first place."); *McBarron v. Kipling Woods, L.L.C.*, 838 A.2d 490, 492 (N.J. Super. Ct. App. Div. Jan. 2, 2004) (holding that summary judgment was inappropriate because genuine issues of material fact existed as to whether the parties intended to form a binding contract).

### B. Breach of Implied Covenant of Good Faith and Fair Dealing (Count Two)

McAvoy alleges Nissan breached the implied covenant of good faith and fair dealing contained in every contract in New Jersey. (ECF No. 33 at 15-16.) Nissan argues that because there was not a valid contract, there can be no breach of the covenant of good faith and fair dealing. (ECF No. 30-4 at 19-20.) In doing so, Nissan argues judgment is appropriate on this claim for the same reasons it articulated McAvoy could not succeed on its breach of contract claim. (*Id.*) In response, McAvoy also relies on his arguments defending the existence of a valid contract as grounds to deny summary judgment in Nissan's favor. (ECF No. 33 at 15–16.)

Since both parties agree the arguments surrounding the formation of a contract are the same for McAvoy's breach of contract and breach of the implied covenant of good faith and fair dealing claims,

the Court need not address the implied covenant argument in detail. The Court relies on its analysis, *supra*, III.A, finding there are genuine issues of material fact regarding the formation of a contract between McAvoy and Nissan. Because the Court has ruled the issues surrounding the contract must be resolved by a factfinder, Nissan's Motion for Summary Judgment on McAvoy's claim of breach of the implied covenant of good faith and fair dealing (Count Two) is **DENIED**.

### C. Disparate Impact Age Discrimination (Count Three)

Nissan argues McAvoy cannot establish Nissan took an action that disparately impacted older workers. (ECF No. 30-4 at 28-31.) Nissan contends McAvoy's expert report from a forensic accountant does not provide the requisite statistical analysis to demonstrate that older workers were significantly more likely to have their salaries reduced as a result of the reorganization. (*Id.* at 29-30; ECF No. 36-1 at 12-15.) Nissan also argues McAvoy cannot disprove Nissan did not have a legitimate business purpose in reducing the salaries. (ECF No. 30-4 at 31-32.)

McAvoy argues he has established a case of disparate impact and that Nissan had no legitimate business purpose in reducing salaries because any rationale offered is a pretext for unlawful age discrimination. (ECF No. 33 at 22–24.) He further contends his forensic accountant expert report is sufficient to establish a discriminatory impact, and that the expert report from Nissan opining that McAvoy's expert lacked sufficient statistical analysis presents a factual question for the jury to resolve. (*Id.* at 24.)[4]

Disparate impact discrimination "involves employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Peper v. Princeton Univ. Bd. of Trs.*, 389 A.2d 465, 478 (N.J. 1978) (quoting *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335, 336 n.15 (1977)). New

---

[4] The Court must interpret McAvoy's expert report by a forensic accountant (ECF No. 33-10) in the light most favorable to McAvoy as the non-moving party.

Jersey courts adopted this standard from the federal approach for disparate impact. *Gerety v. Atl. City Hilton Casino Resort*, 877 A.2d 1233, 1237 (N.J. 2005).

A discriminatory motive is not required to succeed on a theory of disparate impact. *Id.* at 1238. To establish a claim of disparate impact, the employee must "isolat[e] and identify[] the specific employment practices that are allegedly responsible for any observed statistical disparities." *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005) (citation omitted). This disparity must be "significant." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 79–80 (3d Cir. 2017). The "significantly discriminatory impact" is evaluated "on a case-by-case basis." *Id.* at 81.

It is insufficient for the employee to "simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." *Smith*, 544 U.S. at 241. The plaintiff must prove causation; "that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused" the harm alleged. *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 994 (1988); *see also EEOC v. Greyhound Lines*, 635 F.2d 188, 193 (3d Cir. 1980) ("[A] policy does not have a disparate impact unless it is the cause of that impact."). The statistical evidence "must be limited in scope in accordance with Fed. R. Civ. P. 26(b)(1) and tied to the allegations of plaintiff's complaint." *Kresefsky v. Panasonic Commc'ns & Sys. Co.*, 169 F.R.D. 54, 66 (D.N.J. 1996); *accord Petruska v. Reckitt Benckiser, LLC*, No. 14-3663, 2015 WL 9582142, at *3 (D.N.J. Dec. 29, 2015).

After a plaintiff makes a prima facie showing of disparate impact, the employer then must "articulat[e] some legitimate, non-discriminatory reason for its treatment of the employee." *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 118 (3d Cir. 1983) (citation omitted). If the employer presents evidence of a lawful rationale for the employment action, then the plaintiff must show that the asserted reasoning "was merely a pretext for unlawful discrimination." *Id.* "The ultimate burden of persuasion

remains on the plaintiff at all times; the defendant's burden is only to introduce sufficient evidence to create a genuine factual issue concerning the existence of a legitimate justification for the action." *Id.*

There is no "rigid mathematical formula" to apply to assess whether a plaintiff has established a prima facie case of disparate impact discrimination. *Stagi v. Nat'l R.R. Passenger Corp.*, 391 F. App'x 133, 137 (3d Cir. 2010). "'[T]he most widely used means of showing that an observed disparity in outcomes is sufficiently substantial to satisfy the plaintiff's burden of proving adverse impact is to show that the disparity is sufficiently large that it is highly unlikely to have occurred at random.'" *Id.* (quoting 1 B. Lindemann & P. Grossman, Employment Discrimination Law 124 (4th ed. 2007)). A plaintiff may use tests of statistical significance to demonstrate the "probability of the observed disparity obtaining by chance." *Id.*

A court is not required to assume that proffered statistical evidence is reliable. *Watson*, 487 U.S. at 996. The Supreme Court has noted "typical examples" of "weaknesses" in statistical evidence include "small or incomplete data sets and inadequate statistical techniques." *Id.* at 996–97. The Third Circuit has warned that a court "must apply a critical and cautious ear to one dimensional statistical presentation." *Bryant v. Int'l Schs. Sers., Inc.*, 675 F.2d 562, 573 (3d Cir. 1982). In a disparate impact matter,

> a plaintiff will typically have to demonstrate that the disparity in impact is sufficiently large that it is highly unlikely to have occurred at random, and to do so by using one of several tests of statistical significance. There is no precise threshold that must be met in every case, but a finding of statistical significance with a probability level at or below 0.05, or at 2 to 3 standard deviations or greater, will typically be sufficient.

*Stagi*, 391 F. App'x at 140.[5]

---

[5] The Third Circuit has explained the use of statistical analysis in making a prima facie showing of disparate impact:

McAvoy argues, at minimum, Nissan's expert report presents a factual question for the jury to resolve because it opines that McAvoy's expert report lacks the sufficient statistical analysis required to prove his prima facie case. (ECF 33 at 24.) *See Watson*, 487 U.S. at 994. The Court disagrees. A factfinder would not be able to find McAvoy's report statistical analysis as required by *Watson* to prove causation, and therefore, the Court is unable to assess the report under the standard set forth in *Stagi*. There is no discussion of probability or statistical significance in the report, or the likelihood that the perceived disparity could have occurred by chance. Instead, there is only a recitation of data provided by Nissan. The expert report indicates that of the 19 employees subjected to an immediate wage reduction as a result of the ROI, all but one were 50 years old or older. (McAvoy's Expert Report (ECF No. 33-10) at 5.) The report also identifies that 36 of the 53 total employees (approximately 68%) who were impacted by the ROI were 50 years of age or older. (*Id.* at 9.) But, these numbers are provided without context because there is no comparative analysis. The report provides no analysis that "the

> There are two related concepts associated with statistical significance: measures of probability levels and standard deviation. Probability levels (also called "p-values") are simply the probability that the observed disparity is random—the result of chance fluctuation or distribution. For example, a 0.05 probability level means that one would expect to see the observed disparity occur by chance only one time in twenty cases—there is only a five percent chance that the disparity is random. A standard deviation is a unit of measurement that allows statisticians to measure all types of disparities in common terms. In this context, the greater the number of standard deviations from the mean, the greater the likelihood that the observed result is not due to chance. To offer some sense of the relationship between these two measures, two standard deviations corresponds roughly to a probability level of 0.05; three standard deviations correspond to a probability level of 0.0027.

*Stagi*, 391 F. App'x at 137 (citing Lindemann & Grossman, at 126 n.85). "As a legal matter, the Supreme Court has stated that '[a]s a general rule for . . . large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the [result] was random would be suspect to a social scientist.'" *Id.* (quoting *Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977)). "Additionally, many courts accept a 0.05 probability level (or below) as sufficient to rule out the possibility that the disparity occurred at random." *Id.* at 137–38.

14

disparity in impact is sufficiently large that it is highly unlikely to have occurred at random." *See Stagi*, 391 F. App'x at 140. Instead, the report just lists raw data. There is no indication whether older employees were disproportionately affected by the ROI, and to what extent, as is required for a showing of "significantly discriminatory impact." This isolated data, without a comparative statistical analysis to a larger population of Nissan employees, is insufficient to establish a case of disparate impact. *See Watson*, 487 U.S. at 996–97.

A look at statistical reports used in other cases shows the type of comparative analysis required to survive summary judgment and highlights how McAvoy has failed to meet the statistical rigor necessary to demonstrate causation. For example, McAvoy points to *Stagi* as a comparable case. However, in that matter, plaintiff's expert report provided detailed analysis on the probability that the alleged discriminatory impact on female employees "occurred as a result of chance alone." *Stagi*, 391 F. App'x at 142. Specifically, the expert report "analyzed the data using a 'corrected probit analysis' (which corrects for the fact that the same individual might appear in more than one pool), the results yielded a standard deviation of 3.855, with a p-value of less than 0.001" and "using an 'uncorrected' conventional chi-square test to analyze the data, [the expert's] results were even more statistically significant (in terms of being unlikely to have occurred at random), with a standard deviation measure of 8.42." *Id.* at 142 & n.9. "Based on these analyses, [plaintiff's expert] concluded that the [policy] has disproportionately blocked women, relative to men, who might otherwise have been considered for promotion from union positions into management positions." *Stagi v. Nat'l R.R. Passenger Corp.*, No. 03-5702, 2009 WL 2461892, at *6 (E.D. Pa. Aug. 12, 2009). The Third Circuit held the District Court incorrectly granted summary judgment in favor of the defendant because the reports by plaintiff's expert and defendant's expert created a genuine issue of material fact as to whether the employer policy at issue had a disparate impact on female employees because the two reports "yield conflicting conclusions

15

regarding whether the [policy] has an all-things-considered disparate impact on women." *Stagi*, 391 F. App'x at 148.

McAvoy's expert report, however, has not provided this level of statistical analysis. There is no assessment on the probability that the results of the ROI—68% of the impacted employees being at least 50 years old (*see* ECF No. 33-10 at 9)—could have occurred as a result of chance alone. Therefore, the report provides no indication that there is any statistical significance to the percentage of employees negatively impacted by the ROI being at least 50 years old.

When a plaintiff has failed to provide any comparative analysis, the Third Circuit has affirmed summary judgment against the plaintiff. In another matter, more akin to McAvoy's, each plaintiff was a married female teacher who alleged the defendant had a two-tiered contract policy, and that married women were disproportionately excluded from the more-lucrative contracts. *Bryant*, 675 F.2d at 564–65. As evidence for their disparate impact claim, the plaintiffs cited data showing 97 out of the 98 less-lucrative contracts were given to a married woman. *Id.* at 573–74. The Third Circuit concluded that "[e]vidence that only married women had [the less-lucrative] hire contracts does not tell us the number of married women, in contrast to the number of married men, denied the more lucrative [] contracts." *Id.* at 574. The court held that without a comparative statistical analysis the court could not infer a disparate impact and judgment must be entered in favor of the defendant. *Id.* at 574–75.

Likewise, McAvoy's expert report has failed to "offer at least comparative statistics by which we can infer an invidious disparate impact." *See id.* at 573. Without a comparative aspect, a factfinder would be unable to assess whether the ROI had a discriminatory impact. The report fails to make a comparison to the percentage of workers over the age of 50 company-wide or within the field organization, or to the percentage of employees over that age in the AH and AI salary grades. Without that second data point for comparison, there is no analysis of the probability of the resultant 68%

occurring by chance alone. *See Stagi*, 391 F. App'x at 137. Because McAvoy has not put forth any evidence regarding the probability of this occurring by chance alone, he has not made a established claim of disparate impact. *See Greyhound Lines*, 635 F.2d at 193–96 (holding that without the use of "comparative statistics," plaintiff was unable to make prima facie showing that the employment policy caused the alleged disparate impact); *see also Butts v. McCullough*, 237 F. App'x 1, 9 (6th Cir. 2007) (finding that plaintiff's "complete failure to make any such statistical showing is fatal to his claim here"). Accordingly, Nissan's Motion for Summary Judgment as to Count Three is **GRANTED.**

### D.  Age Discrimination (Count Four)

Count Four of McAvoy's Complaint alleges Nissan violated the NJLAD by engaging in unlawful discrimination when Nissan reduced his salary because of his age. (ECF No. 1, Ex. A at 7.) Nissan has moved for summary judgment on this claim, arguing McAvoy has failed to meet his burden of establishing a case of age discrimination. (ECF No. 30-4 at 20-26.) Specifically, Nissan argues McAvoy's salary was reduced not because of his age, but because of a company-wide initiative to ensure all employee's salaries were within the pay range of their respective positions. (*Id.* at 22-23.) McAvoy, however, contends he has sufficiently stated a claim for age discrimination and that a jury could find Nissan's stated rationale for reducing salaries was a pretext for age discrimination. (ECF No. 33 at 16–21.)

To prove age-related employment discrimination under the NJLAD, New Jersey courts have adopted the burden-shifting analysis established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Victor v. State*, 4 A.3d 126, 140–41 (N.J. 2010) (observing that "employment discrimination claims [under the NJLAD] proceed in accordance with the *McDonnell Douglas* burden-shifting paradigm"). Accordingly, a plaintiff must first demonstrate that each of the four elements of a prima facie case of age discrimination has been met. *Kirschling v. Atl. City Bd. of Educ.*, 10 F. Supp. 3d

17

587, 593 (D.N.J. 2014), *aff'd*, 604 F. App'x 153 (3d Cir. 2015). The four prongs of a prima facie case of age discrimination are: (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for the position held; (3) plaintiff suffered an adverse employment action despite these qualifications; and (4) there is a logical basis to find the employer's decision was significantly affected by the plaintiff's age. *Arenas v. L'Oreal USA Products, Inc.*, 790 F. Supp. 2d 230, 236 (D.N.J. 2011), *aff'd*, 461 F. App'x 131 (3d Cir. 2012). "Establishing a prima facie case gives rise to a presumption that the employer unlawfully discriminated against the employee." *Kirschling*, 10 F. Supp. 3d at 594 (citation omitted).

If a plaintiff establishes a prima facie case, then the burden shifts to the employer "to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.* (citation omitted). If the employer is able to articulate such a reason, then the burden shifts back to the plaintiff, who must then demonstrate, by a preponderance of the evidence, that the proffered rationale was a pretext for discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–55 (1981). In response to a summary judgment motion, the plaintiff need not conclusively disprove the employer's stated rationale; but rather, he must "cast such serious doubt on the veracity of the employer's articulated legitimate reason as to allow a jury to reasonably conclude that the employer was motivated to act for the discriminatory reason alleged by plaintiff." *Beatty v. Farmer*, 840 A.2d 856, 861 (N.J. Super. Ct. App. Div. 2004). "[T]he non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (internal citations omitted).

The Court finds McAvoy has demonstrated a prima facie case of age discrimination and that a jury could reasonably conclude Nissan was motivated to act based on age discrimination. *See Beatty*,

840 A.2d at 861. Nissan contends it reduced McAvoy's salary "as part of a company-wide initiative to bring all employees' salaries within the salary grade range for their respective positions."[6] (ECF No. 30-4 at 22.) Nissan's argument, however, ignores the first step the company took to reduce the salaries, which was the initial lowering of the grade level of employees. A jury could reasonably conclude that the totality of Nissan's actions was motivated by a desire to reduce the higher salaries of its older employees. Moreover, Nissan does not dispute it informally tracked which employees were eligible for retirement and likely to retire, and that prior to implementing the ROI, the company identified each employee subject to the ROI based on certain factors, including their age and likelihood to retire. (ECF No. 33-7; ECF No. 33-1 at 8, 10; ECF No. 36 at 8, 10.)

The Supreme Court has held that an employer taking action based on its employees' pension status may be engaging in unlawful age discrimination. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 613 (1993) ("Pension status may be a proxy for age . . . in the sense that the employer may suppose a correlation between the two factors and act accordingly."). Likewise, a jury may also infer that lowering the salary band for high-ranking employees, which would take experience, and thus age, to achieve, was used by Nissan as a proxy for age. McAvoy has pointed to evidence, if accepted by the jury, which could indicate Nissan was precise in targeting the employees affected by the ROI to be older employees. McAvoy's expert report indicates all four employees in the Northeast Region immediately impacted by the ROI in 2014 were 50 years old or older. (ECF No. 33-10 at 3.) The expert report further indicates that of the 19 employees subjected to an immediate wage reduction as a result of the ROI, all but one were 50 years old or older. (*Id.* at 5.) The report also identifies 36 of the 53 total employees who were negatively impacted by the ROI as 50 years of age or older. (*Id.* at 9.)

---

[6] Nissan concedes, for the purposes of summary judgment, that McAvoy could establish the first three prongs of his prima facie case of age discrimination. (ECF No. 30-4 at 22.) The Court, therefore, will not discuss those factors.

19

McAvoy cites to other evidence, which a jury may conclude casts doubt on Nissan's non-discriminatory explanations for reducing McAvoy's salary. At Regional Vice President Gary Frigo's retirement party in January 2015, Frigo shouted across the room, in front of thirty employees, to Regional Operations Manager Jun Watanabe, "When are you going to get McAvoy to retire?" (ECF No. 30-5 at 12; ECF No. 33-1 at 13, 27; ECF No. 36 at 12.) Both Frigo and Watanabe were involved in Nissan's reorganization, and attended McAvoy's April 2014 meeting where he was informed that his salary was going to be reduced. (ECF No. 30-5 at 8; ECF No. 33-1 at 22.)

The Court finds a jury may reasonably find, based on the evidence, that Nissan's stated rationale is "unworthy of credence" and infer Nissan did not take action for its asserted non-discriminatory reasons. *See Fuentes*, 32 F.3d at 765. Accordingly, Nissan's Motion for Summary Judgment as to Count Four is **DENIED**.

### IV. CONCLUSION

For the reasons set forth above, Defendant Nissan's Motion for Summary Judgment (ECF No. 30) is **DENIED** as to Counts One, Two, and Four. Judgment is **GRANTED** in favor of Defendant on Count Three. The Court will enter an appropriate Order and Judgment.

**Date:** January 16, 2018                              */s/ Brian R. Martinotti*
                                                        **HON. BRIAN R. MARTINOTTI**
                                                        **UNITED STATES DISTRICT JUDGE**

20